UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| CAPITAL CONFIRMATION, INC, ) | |
| ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| ) | **Case No. 3:09-0412** |
| ) | **Judge Trauger** |
| **v.** ) | |
| ) | |
| **AUDITCONFIRMATIONS, LLC,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM

Pending before the court is the Motion to Dismiss, or, in the Alternative, to Change Venue filed by defendant Auditconfirmations LLC ("Audit") (Docket No. 16). For the reasons discussed herein, this motion will be granted, and this case will be dismissed for lack of personal jurisdiction.

## FACTUAL AND PROCEDURAL BACKGROUND

The parties in this case are competitors in the field of processing electronic audit confirmations.[1] To understand this relatively new business and the issues involved in this motion, a little background is necessary. A typical large company, from time to time, will need to have its financial statements audited. (Docket No. 22 Ex. 1 at 1-2.) When this need arises, the company will likely employ an independent auditor, who is usually a Certified Public

---

[1]In accordance with the standard of review appropriate for Rule 12(b)(2) motions, discussed below, the facts have been drawn from the Complaint (Docket No. 1) and the affidavits and exhibits filed in support of the briefings on this motion. (See Docket Nos. 17, 21, 22, and 26.)

1

Accountant (CPA). (*Id.*) The auditor will, of course, examine the company's financial statements and, within those documents, the assets and liabilities reported by the company. (*Id.*) To continue with the audit, the auditor will then seek to confirm the accuracy of the monetary assets reported by the company – a process known as "confirmation." (*Id.*) For instance, if the company reported on its financial statements that it had a $75,000 account at Bank A, the auditor will seek to confirm that information by sending a confirmation request to Bank A. In the past, this confirmation process could be time-consuming, as the auditor would have to wait for the bank to receive and to respond to his mailed request. (*Id.*) Additionally, there was no way for the bank or the auditor to know, for sure, that the person sending or receiving the request was who he or she claimed to be.

To help auditors confront the delays and potential fraud intrinsic in a paper-based audit confirmation process, the parties in this case entered the field of processing electronic audit confirmations. The plaintiff, Capital Confirmation, Inc. ("Capital"), which is incorporated in Tennessee and has its principal place of business in Brentwood, Tennessee, has been in the business for "almost seven years" and claims to have developed a "propriety closed-system process ... that allows for increased efficiency and a reduction in fraud potential over traditional open-systems processes conducted via conventional or electronic mail." (Docket No. 21 at 1-3.) Capital contends that its efficient and safe "closed network" model "has allowed Capital to become the leading provider of secure, electronic audit confirmation services." (*Id.*)

In December 2008, the defendant, Audit, which is incorporated in Colorado and has its principal place of business in Denver, entered this growing industry, by launching a website called [www.auditconfirmations.com.](www.auditconfirmations.com.) ("the website"). (Docket No. 17 Ex. 1 at 1.) The affidavit

of Daniel Zitting, who is a principal at Audit and who is the "principal architect" of the website, explains how Audit's clients use the website. (*Id.*) Zitting states that "after customers register with Audit's website, they are able to use the website to facilitate the process of confirming the balances of deposit and loan accounts at financial institutions. Customers provide personal identification information (e.g. name, address, phone number, email address, and credit card authorization information). Customers also provide information that is necessary to request an electronic confirmation of a bank balance (*e.g.*, account holder identification information, account number, financial institution information, banker information, etc.) This allows the confirmation to be electronically directed and authenticated by the intended recipients." (*Id.* at 1-2.)

Capital clearly has little respect for Audit's business model and its audit confirmation system. (Docket No. 21 at 1.) Further, Capital contends that Audit's website contains misleading and false information about, among other things, the depth of Audit's customer base and the security and regulatory compliance that Audit offers to its customers. (Docket No. 1 at 3-4.) Capital contends that these misrepresentations amount to "unfair competition" in violation of state and federal law, and, therefore, Capital has sued Audit here. (*Id.* at 7-9.)

As indicated above, the current dispute largely concerns whether Audit is amenable to personal jurisdiction in Tennessee. Through Zitting, Audit argues that, to date, in performing the business outlined above, Audit has not had any meaningful contact with Tennessee. In his affidavit, Zitting states that Audit's clientele are CPAs "located primarily in Colorado and the surrounding Rocky Mountain region." (Docket No. 17 Ex. 1 at 2.) Zitting contends that Audit receives 75-80 percent of its business from the Rocky Mountain region, and that this is the

region in which Audit "advertises and performs direct marketing." (*Id.*) Zitting further contends that Audit "does not have a place of business, employees, and/or agents in Tennessee" and that Audit has "never conducted, intended to conduct, solicited business from or directed any advertising specifically to Tennessee." (*Id.*)

Zitting also stresses that, while the website is, of course, accessible from Tennessee, no legitimate business emanating from or directed to Tennessee has been completed on the website.[2] According to Zitting, on January 5, 2009, only about ten days after the website went "live" on-line, a "Mr. Frank Jepson" performed a transaction on the website from Tennessee; however, through briefing, it has become clear that there is no Frank Jepson. Rather, this transaction was performed by individuals acting on behalf of Capital, as a way of building their arguments in support of personal jurisdiction in this case. (Docket No. 17 Ex. 1 at 2-3; Docket No. 22 Ex. 1 at 4.) "Mr. Jepson" also performed two additional transactions on the website, one complete and one incomplete, over the course of the next few months. (Docket No. 17 at 4.) Other than "Mr. Jepson's" activities on the website, Zitting contends that the website's "only other interaction from Tennessee" was an audit confirmation request that "was aborted before" any payment was made by the customer. (Docket No. 17 Ex. 1 at 4.) It appears that this transaction, although "incomplete," was performed by a CPA legitimately accessing the website from Memphis, Tennessee. (*Id*; Docket No. 22 Ex. 1 at 4.)

In responding to Audit's motion, Capital, through the affidavit of its Chief Marketing Officer Brian Fox, brought out additional facts about the website, which, it claims, show that

---

[2] Using a process called "GEO-IP," Zitting is able to identify the location of each individual who performs, or attempts to perform, a transaction on the website. (Docket No. 17 Ex. 1 at 4.)

4

Audit sought customers "nationwide," including from Tennessee. (Docket No. 22 Ex. 1 at 3-4.) Fox states that he repeatedly visited the website from his location in Brentwood, Tennessee, and, strongly implying that he was "Frank Jepson," states that he "was able to access the Audit Website and to create an account for the Audit service." (*Id.*) According to Fox, when he was visiting the website and setting up his account, there were no stated geographic restrictions as to who could use the service, and the website encouraged and permitted anyone and everyone to "get an account" and to "sign up for an account now" by submitting their credit card information in order to pay for confirmations. (*Id.*) Moreover, Fox states that, on the website, Audit claims that its service "can be used at any bank" and that the "audit confirmation can be sent to a contact at any bank." (*Id.*)

Fox also states that, from the same computer in Brentwood, he conducted Google searches such as "electronic audit confirmation" and, in response to those searches, Audit's website "appears among the paid advertisements in the column labeled 'Sponsored Links.'" (*Id.* at 4.) According to Fox, who is familiar with Google's "Sponsored Links" column, this "indicates Audit's participation in Google's AdWords program, meaning Audit paid Google for first-page placement on results pages for [] search terms" such as "electronic audit confirmation." (*Id.*) Relying on his familiarity with AdWords, Fox claims that Audit "could have chosen to exclude itself from results of searches emanating from computers located in Tennessee," but Audit apparently did not make such an election. (*Id.*) Finally, Fox claims that Audit has, through direct marketing, reached out to clients outside of the Rocky Mountain region, although he does not claim that these efforts extended to Tennessee. (*Id.* at 5.)

The court has also reviewed the "screen shots" provided by Fox and Zitting of the

website, which confirm the specific statements in their affidavits. The screen shots also confirm that, on a more general level, on Audit's website, one may sign up for and manage an audit confirmation account and, additionally, one who is newer to the website can learn about Audit's services, electronic audit confirmation and how the process works in general. (*See* Docket No. 22 Ex. 1 at 7-21.)

## ANALYSIS

Capital contends that Audit, largely through misrepresentations on its website, is engaging in unfair competition in violation of 15 U.S.C. § 1051 *et seq*. (Lanham Act claim), and in violation of Tennessee law prohibiting unfair competition and intentional interference with business relationships. Audit has moved to dismiss Capital's claims under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction. Alternatively, Audit has moved to dismiss Capital's state law claims under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. Because the jurisdictional issues are dispositive, it is not necessary to reach the Rule 12(b)(6) arguments in this case.[3]

**I.     Personal Jurisdiction**

   **A.     Standard of Review**

A court deciding a motion to dismiss for lack of personal jurisdiction has three options; it may (1) rule on the motion on the basis of the affidavits submitted by the parties, (2) permit discovery in aid of the motion, or (3) conduct an evidentiary hearing on the merits of the motion. *See Dean v. Motel 6 Operating LP*, 134 F.3d 1269, 1272 (6th Cir. 1998). In any proceeding,

---

[3]Likewise, it is not necessary to address Audit's other alternative argument that venue should be transferred in this case under 28 U.S.C. § 1404. (See Docket No. 16 at 2.)

however, the party asserting jurisdiction has the burden of proof. *See Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002). Additionally, in the face of a properly supported motion for dismissal, the plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction. *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991).

Where, as here, both sides have submitted competing affidavits but no party has requested an opportunity for discovery on the jurisdictional issue or an evidentiary hearing, it is entirely appropriate for the court to decide the jurisdictional issue based on the affidavits presented. *Id*. When a court rules on a motion to dismiss for lack of personal jurisdiction without the benefit of an evidentiary hearing or discovery, the party asserting jurisdiction need only make a *prima facie* showing of jurisdiction to defeat the motion. *Id.*

In examining whether the party asserting jurisdiction has made this *prima facie* showing, the court is to construe the pleadings and affidavits in the light most favorable to that party, and the court must not weigh or consider the controverting assertions and facts presented by the other side. *Compuserve v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996). This manner of review prevents "non-resident defendants from regularly avoiding personal jurisdiction simply by filing an affidavit denying all jurisdictional facts." *Id.* If, under this standard of review, "the specific facts that the plaintiff alleges collectively fail to state a *prima facie* case for jurisdiction," the court should dismiss the case. *Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 149 (6th Cir. 1997) (internal quotation omitted).

Here, while the parties have each submitted an affidavit from a senior official at their respective companies, there is not considerable dispute about the facts. For instance, the parties

do not dispute that the only established contact between Audit and Tennessee that was not initiated by Capital was the "aborted" transaction performed by the Memphis CPA. Additionally, there is no dispute (1) about the interactive operations that one can perform on Audit's website, that is, both parties recognize that accounts can be registered and maintained on the site, and services can be ordered on the site; (2) that Audit's website is accessible from Tennessee; and (3) that Audit participates in Google's Adwords program and does not restrict Tennessee users from obtaining the same search results as any other user.

### B. Personal Jurisdiction Over Audit

Because this action raises a federal question, the issue of whether this court may exercise personal jurisdiction over Audit depends on the specific limitations of Tennessee's long-arm statute and the constitutional principles of due process. *Bridgeport Music, Inc. v. Still N The Water Publishing*, 327 F.3d 472, 477 (6th Cir. 2003). Tennessee's long-arm statute has been consistently construed to extend to the limits of federal due process, and, therefore, the two inquiries are merged and the court need only determine whether exercising personal jurisdiction over Audit here is consistent with federal due process requirements. *Id.*

In order for due process to permit the exercise of personal jurisdiction over a non-resident defendant, such as Audit, that defendant must have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Youn v. Track, Inc.*, 324 F.3d 409, 417-18 (6th Cir. 2003) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The Supreme Court has identified "general" jurisdiction and "specific" jurisdiction as distinct bases for personal jurisdiction – a demonstration of the contacts necessary for either basis is sufficient to establish personal

jurisdiction. *Id.*

Specific jurisdiction exists when a state exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum. *Id.* General jurisdiction, on the other hand, exists when a defendant's contacts with the forum are "substantial" and "continuous and systematic." *Id.* When personal jurisdiction is based on general jurisdiction, a state may exercise jurisdiction over a defendant, even if the suit does not arise out of the defendant's contacts with the state. *Id.* Here, the parties agree that, on the record presented, general jurisdiction is not a credible basis for establishing personal jurisdiction over Audit, and, therefore, Capital "seeks only to establish specific personal jurisdiction over Audit."[4] (Docket No. 17 at 6; Docket No. 21 at 7.)

In *Southern Machine Co. v. Mohasco Industries, Inc.*, the Sixth Circuit established a three-part test for determining whether the exercise of specific jurisdiction was consistent with the principles of due process. "First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequence caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." 401 F.2d 374,

---

[4] While conceding that the facts before the court do not justify a finding of general jurisdiction, Capital claims that Audit's "records likely confirm the existence of general personal jurisdiction in that its contacts with this forum, when taken to include [] audit clients and their banks are of such a continuous and systematic nature" as to justify the exercise of general jurisdiction. (Docket No. 21 at 7.) Not only is this argument pure undeveloped speculation, but the Sixth Circuit has been very clear that the out-of-state operation of a website (which is the medium by which Capital contends Audit carries out its entire business) that allows a company to do business in a given state cannot serve as the basis, in and of itself, for general jurisdiction. *Bird*, 289 F.3d at 874.

9

381 (6th Cir. 1968). While a motion to dismiss for lack of specific personal jurisdiction may be maintained based on prongs two and three of the *Mohasco* test, purposeful availment is the "sine qua non," or absolutely indispensable, element of personal jurisdiction, and, therefore, disputes about whether or not there is specific personal jurisdiction in a given case often rise or fall on the issue of purposeful availment. *See Air Products and Controls, Inc. v. Safetech International, Inc.*, 503 F.3d 544, 550-51 (6th Cir. 2007).

### 1. **Purposeful availment**

Before a defendant may be sued in a forum, the defendant must "purposefully avail" itself of the "privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)(internal citation and quotation omitted). This "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." (*Id.*)

Purposeful availment is "something akin to a deliberate undertaking," that is, a deliberate effort by the defendant to direct its activities toward, and to make contact with, the forum. *Bridgeport Music*, 327 F.3d at 478 (internal quotation omitted). Purposeful availment exists "when the defendant's contacts with the forum state proximately result from actions by the defendant *himself* that create a substantial connection with the forum state, and when the defendant's conduct and connection with the forum are such that 'he should reasonably anticipate being haled into court there.'" *Id*. (quoting *CompuServe*, 89 F.3d at 1263) (emphasis in original).

Unique issues regarding "purposeful availment" have arisen with the advent of the

10

Internet. The seminal case in this area of whether the operation of a website from outside of the forum could constitute "purposeful availment" was *Zippo Mfg. Co. v. Zippo Dot Com, Inc.* In *Zippo*, a Western District of Pennsylvania court concluded that purposeful availment in this context should be evaluated based on a "sliding scale" of interactivity; that is, the more interactive the website and the more the defendant directs the activities of the website toward the forum state, the more likely it is that the defendant has purposefully availed itself of doing business in the relevant forum. 952 F.Supp. 1119, 1124 (W.D. Pa. 1997). In adopting the basic reasoning of *Zippo*, the Sixth Circuit has stated the rule that a "defendant purposefully avails itself of the privilege of acting in a state through its website if the website is interactive to a degree that reveals specifically intended interaction with the residents of the state." *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 890 (6th Cir. 2002).

The question, then, is what amounts to "specifically intended interaction with the residents of the state." One arguably reasonable view would hold that, by setting up a commercial website, which, by its nature, can receive customers from anywhere in the country, the website owner has "specifically intended interaction with the residents of" every state. Indeed, this is a main argument Capital makes in support of personal jurisdiction here. (Docket No. 21 at 13.) ("the Audit website manifests clearly Audit's intent to do business with residents of Tennessee and every other state in the country.")

Despite the arguable reasonableness of this view, the Sixth Circuit has concluded that simply maintaining a website available to residents in the forum state is not purposeful availment. *Neogen Corp.*, 282 F.3d at 890. Moreover, even where the website performs a commercial function, the Sixth Circuit has indicated that purposeful availment does not exist

11

simply because individuals *could* reach the website from the forum state and transact business on the site from the forum. *See Bird*, 289 F.3d at 874-75 (finding purposeful availment where the defendant's commercial website was available to the residents of the forum state (Ohio) *and* the plaintiff contended that the defendant had, through the website, accepted the business of more than 4,000 Ohio residents).

Indeed, in this context, the general consensus appears to be that more than mere accessibility from the forum is required to establish the type of "deliberate" conduct that constitutes purposeful availment. As the Third Circuit concluded when discussing *Zippo* and its progeny, "the mere operation of a commercially interactive web site should not subject the operator to jurisdiction anywhere in the world. Rather, there must be evidence that the defendant 'purposefully availed' itself of conducting activities in the forum state, by directly targeting its web site to the state, knowingly interacting with residents of the forum state via its web site, or through sufficient other related contacts." *Toys R Us, Inc. v. Step Two, SA*, 318 F.3d 446, 454 (3rd Cir. 2003).

Several district court opinions from this Circuit have likewise stated that, in order to demonstrate purposeful availment, the plaintiff must show that the defendant engaged in some sort of intended, deliberate activity with the forum state, beyond the operation of a generally accessible, interactive commercial website. For instance, in *Roberts v. Paulin*, the defendant maintained a website that provided information about a type of sock called a "toezie," and the website allowed customers to purchase the sock online. 2007 WL 3203969, *1 (E.D. Mich. Oct. 31, 2007). The evidence showed that the defendant had virtually no ties to the forum (Michigan) other than that the website was accessible from Michigan and, through the website, the defendant

had sold a small amount of the product (less than $500 worth) to customers in Michigan. *Id.*

Relying largely on the case law above, the *Roberts* court concluded that the plaintiff had not made out a *prima facie* case for personal jurisdiction, because purposeful availment had not been shown. *Id.* at *5-6. Specifically, citing the *Toys R Us* case, the court noted that "courts generally require something more in the way of a specific, meaningful connection with the forum state in particular, as opposed to a connection with the nation as a whole," in order to find personal jurisdiction based on an interactive commercial website. *Id.* No such meaningful connection was present here – the plaintiff did not mention Michigan on the website, had not sent any sales agents to Michigan, and had not opened any Michigan stores. *Id.* While there had been a few sporadic sales to Michigan, the court concluded that, when contrasted with the lack of any indication that the defendant had specifically "directed her activity" toward Michigan, those few random, sporadic sales to Michigan were not "meaningful." *Id*. In conclusion, the court found that it could not exercise jurisdiction over the defendant because, by simply "maintaining a website, defendant is no more benefitting from the laws of Michigan than from the laws of any other state." *Id.*

Other district courts in this Circuit have reached the same conclusion; that is, the mere maintenance of an interactive, commercial website, accessible from anywhere, without more, cannot constitute purposeful availment. *See Flagstar Bank v. Freestar Bank*, 2008 WL 4539389, *3 (E.D. Mich. Oct. 7, 2008)("the court concludes that the creation and the maintenance of an interactive website cannot – without more – serve as a sufficient basis upon which to subject a defendant to personal jurisdiction."); *Static Control Components, Inc. v. Lexmark International, Inc.*, 2005 WL 2009273, *4 (E.D. Ky. Aug. 19, 2005)("although [the defendant's] website might

13

be considered somewhat interactive, it appears that it is not interactive to a degree that reveals it specifically intended interaction with residents of Kentucky."); *Digital Filing Sys. v. Frontier Consulting, Inc.*, 2006 WL 1663281, *4 (E.D. Mich. June 13, 2006)(although items were available for sale on the website, "the fact that [the defendant] has never sold a product or service in Michigan or to a Michigan resident or entity [dictates that the defendant's] contact with Michigan was so limited that it should not 'reasonably anticipate being haled into court' here"); *Pride Distributors, Inc. v. Nuzzolo*, 2007 WL 1098286, *4-5 (E.D. Mich. April 10, 2007)(where the only connection between the defendant and the forum was an attempt by plaintiff's counsel to order a product off the defendant's website, "plaintiff has not shown that defendant entered into contracts with residents of Michigan that involved the knowing and repeated transmission of orders over the Internet ... defendant's operation of the website does not constitute purposeful availment by defendant since plaintiff has not shown additional contacts by defendant with Michigan other than the one time access [by plaintiff's counsel] ...")

Additionally, when district courts in this Circuit have exercised personal jurisdiction in this context, they have done so because, in addition to a generally accessible website, the plaintiff showed that the defendant made other, purposeful and significant contacts with the forum. *See e.g. Sony/ATV Music Publishing LLC v. CAVS USA, Inc.*, 2009 WL 2177110, *5 (M.D. Tenn. July 21, 2009)(Echols, J)("the maintenance of an interactive website should also be considered in light of other contacts with the forum state ... the court finds that [defendant's] maintenance of a website, coupled with its contracts with a Tennessee resident and its marketing of karoake songs through its distributors [who sell to Tennessee residents] shows a purposeful availment of the laws and protections of this forum."); *Word Music v. Priddis Music*, 2007 WL

3231835, *7 (M.D. Tenn. Oct. 30, 2007)(Wiseman, J)(basing purposeful availment finding on the interactivity and accessibility of the website at issue and the fact that "at least one Tennessee resident" purchased and received the relevant product by ordering it on the website and then that resident was further solicited by the defendant to order more product).

Capital largely relies on two cases for the proposition that Audit's limited contacts with Tennessee are sufficient to constitute purposeful availment. (Docket No. 21 at 10 citing *First Tennessee Nat'l Corp v. Horizon Nat'l Bank*, 225 F. Supp. 2d 816 (W.D. Tenn. 2002); *EASI v. Xcentric Ventures, LLC*, 2007 WL 1557202 (M.D. Tenn. May 25, 2007)(Trauger, J)). Capital contends that these cases show that the "completion of a transaction [in the forum state] is not a prerequisite to a *prima facie* showing of jurisdiction." (Docket No. 21 at 10.) A brief discussion of these two cases is appropriate.

*First Tennessee* was a trademark infringement action between two national banking institutions; the plaintiff claimed that there was personal jurisdiction over the defendant in Tennessee, despite the fact that no evidence had been presented that the defendant had Tennessee customers. 225 F. Supp. 2d at 820-21. The court agreed with the plaintiff, relying, in part, on the fact that, under *Zippo*, the defendant's banking website was "highly interactive," permitting the filing of on-line mortgage applications and other similar transactions. *Id*. Importantly, the court also focused on the fact that "[the plaintiff] also asserts that Tennessee is included in a list of states to which [the defendant] directs its business activities. Furthermore, [the defendant's] website states that [the defendant] is approved to lend in 'ALL 50 States.'" *Id*. Therefore, as to purposeful availment, the court concluded that the defendant's "website evidences that it is willing and capable of providing services to Tennessee residents. Given that

15

the plaintiff need only make a *prima facie* showing of jurisdiction, the defendant's alleged maintenance of a highly interactive website that solicits Tennessee customers is a sufficient basis to find that the defendant has purposefully availed itself of acting in the forum state." *Id.* at 821 (internal quotation omitted).

In *EASI*, this court found that the defendant, who operated a "very interactive" consumer advocacy website and who was sued by a Tennessee company for comments made on the website about the company, was subject to personal jurisdiction in Tennessee. 2007 WL 1557202, *10. In that case, the evidence showed that the defendant had knowingly engaged in posting negative comments about Tennessee businesses (including the plaintiff) submitted by Tennessee residents. *Id.* at *7-10. Given that the defendant had reached out, on multiple occasions, to Tennessee residents and had repeatedly posted negative information about Tennessee companies, including the plaintiff, the defendant should have "reasonably anticipate[d] being haled into court" in Tennessee, and, therefore, the exercise of personal jurisdiction over the defendant was appropriate.

Therefore, in spite of Capital's focus on these two cases, the holdings in *First Tennessee* and *EASI* are entirely consistent with the conclusions in *Roberts*, *Toys R Us* and the other cases discussed above – that is, all of these cases stand for the proposition that purposeful availment requires "something more" than the operation of a generally accessible, interactive commercial website reachable from the forum. That is, the plaintiff must sufficiently show that the defendant has taken some sort of "deliberate" step in order to establish a "substantial," meaningful "connection" with the forum. The pivotal question here, then, is whether Capital has shown that Audit took any such deliberate step.

Simply put, Capital has not made the required showing. While Capital has shown that Audit maintains a generally accessible commercial website, there is no evidence that Audit has taken any specific, deliberate step to establish a substantial connection with Tennessee. There is no indication in the record that Audit has marketed itself in Tennessee, had any Tennessee employees or agents, or that Audit has had any legitimate Tennessee customers. While the contacts initiated by Capital and the Memphis CPA show that, in theory, Audit *could* have clients from Tennessee sign up for an account with Audit, there is no indication that anyone from Tennessee actually has legitimately sought out Audit's services and actually signed up for an account with Audit that he or she intended to use. (Docket No. 17 Ex. 1 at 3-4.) Therefore, there is no indication that Audit has had anything resembling a business relationship with anyone in Tennessee. Indeed, the contacts initiated by Capital and the Memphis CPA are precisely the type of "random" or "attenuated" contacts that the Supreme Court has concluded are not sufficient to establish purposeful availment and personal jurisdiction. *See Burger King*, 471 U.S. at 475.

Capital stresses that there are no geographical restrictions stated by Audit on its website, and, indeed, on its website, Audit states that the "audit confirmation can be sent to a contact at any bank," a statement which, under Capital's view, exposes Audit to personal jurisdiction anywhere. (Docket No. 21 at 4.) Likewise, Capital notes that Audit has not limited the regions from which one may access its website or restricted the scope of its participation in the Google AdWords program. (*Id.* at 5.)

These arguments, which challenge Audit's failure to "opt out" or take specific, pre-emptive steps to prevent any contact with Tennessee, misapply the purposeful availment

17

standard. Again, to demonstrate purposeful availment, the plaintiff must show that the defendant took some "deliberate" action by which a "substantial connection" with the forum was created. *Bridgeport Music*, 327 F.3d at 478. The passive failure to take pre-emptive measures to avoid contact with a forum simply does not amount to the type of thoughtful, affirmative conduct necessary to show "purposeful availment."[5] *See id.* ("purposeful availment is ... something more than a passive availment of the forum state's opportunities.")(internal citation and quotation omitted).

Here, the plaintiff Capital has shown that the defendant Audit maintains an interactive commercial website. That said, Capital has failed to put forth evidence that demonstrates that Audit purposefully availed itself of doing business in Tennessee, as that term is defined. Rather, Capital has only shown that Audit had a few "attenuated" and "random" contacts with the state of Tennessee. Capital has not shown any legitimate effort on Audit's part to direct its conduct toward the state of Tennessee, and, therefore, Capital has not established the purposeful availment required to make out a *prima facie* case of personal jurisdiction.

---

[5] As to the statement that its services may be used in conjunction with "any bank," it is helpful to recall that, in *First Tennessee*, while a similar boast was made about the defendant's service being available in "all 50 states," there was also evidence that the defendant did, in fact, direct its business activities toward Tennessee. 225 F. Supp. 2d at 820.

## CONCLUSION

For the reasons discussed herein, the defendant's Rule 12(b)(2) Motion to Dismiss for lack of personal jurisdiction will be granted. As the jurisdictional issue is dispositive, there is no basis to consider the defendant's alternative Rule 12(b)(6) Motion to Dismiss or the Section 1404(a) Motion to Transfer Venue.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge